UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARY A. HESS,

                                    Plaintiff,

        v.

MID HUDSON VALLEY STAFFCO LLC,

                                    Defendant.

No. 16-CV-1166 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Michael Howard Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Plaintiff*

Brian Joseph Clark, Esq.
Allison Brooke Gotfried, Esq.
Venable LLP
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Plaintiff Mary A. Hess ("Plaintiff") brought this Action against her former employer, Mid

Hudson Valley StaffCo LLC ("Defendant" or "MHVS"), alleging that it terminated her because

of her age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.

§ 621.  (Compl. (Dkt. No. 1).)  Before the Court is Defendant's Motion for Summary Judgment.

(Notice of Mot. For Summ. J. (Dkt. No. 26).)  For the following reasons, the Motion is granted.

## I. Background

### A. Factual Background

The following facts are taken from Defendant's statement pursuant to Local Civil Rule 56.1, (Def.'s Rule 56.1 Statement ("Def.'s 56.1") (Dkt. No. 29)), Plaintiff's response to Defendant's 56.1 statement, (Pl.'s Resp. to Def.'s 56.1 Statement ("Pl.'s 56.1") (Dkt. No. 35)), Plaintiff's counter-statement pursuant to Rule 56.1, (*id.* at 49–58 ("Pl.'s Counter-56.1")), and the exhibits submitted by both Parties, (Decl. of Brian J. Clark, Esq. in Supp. of Mot. for Summ. J. ("Clark Decl.") (Dkt. No. 28); Aff. Of Michael H. Sussman, Esq. in Opp'n to Mot. for Summ. J. ("Sussman Aff.") (Dkt. No. 34)), and are recounted in the light most favorable to Plaintiff, the non-movant. The facts as described below are not in dispute unless indicated otherwise.[1]

#### 1. The Parties

In May 2014, pursuant to an order of the United States Bankruptcy Court, Westchester County Health Care Corporation ("WCHCC") purchased the assets of the former St. Francis Hospital, a non-profit community hospital in Poughkeepsie, New York, and renamed the facility MidHudson Regional Hospital of Westchester Medical Center. (Def.'s 56.1 ¶¶ 2–4.) Defendant MHVS, a professional employer organization, entered into an agreement with WCHCC to

---

[1] The Court notes that some of Plaintiff's purported denials in her 56.1 statement are merely semantic disagreements with Defendant's language or recitations of other, often irrelevant facts. (*E.g.*, Pl.'s 56.1 ¶ 8 (noting that Defendant hired Plaintiff "without scrutiny or inquiry" but not actually refuting that she was hired as a Start of Care nurse); *id.* ¶ 82 (raising semantic dispute regarding use of word "about" instead of "for"); *id.* ¶ 87 (not admitting or denying, and instead adding irrelevant facts).) These paragraphs do not actually challenge the factual substance described in the relevant paragraphs in Defendants' 56.1 statement, and thus the Court will not consider them as creating disputes of fact. *See, e.g.*, *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("Many of Plaintiff's purported denials—and a number of his admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts."); *id.* ("[A] number of Plaintiffs' purported denials quibble with Defendants' phraseology, but do not address the factual substance asserted by Defendants.").

employ staff at this facility. (*Id.* ¶¶ 1–2.) It is undisputed that Defendant offered employment to, and did hire, former St. Francis staff, including Plaintiff, but Plaintiff contends that Defendant employed no vetting or selection process of its own. (*Id.* ¶ 5; Pl.'s 56.1 ¶¶ 5, 8–9.) Plaintiff was 69 or 70 years old when hired. (Def.'s 56.1 ¶ 9.)

Plaintiff had worked as a full-time registered nurse for approximately 12–14 years prior to her hiring. (*Id.* ¶ 6.) In particular, when hired by Defendant on May 9, 2014, she was specifically working as a Start of Care nurse in the Home Health Care Department, a position she had for approximately two to three years. (*Id.* ¶¶ 8, 10.) That Department employed approximately 60 people, 50 of whom were over the age of 40 and at least 14 of whom, including two managers, were over the age of 60. (*Id.* ¶¶ 202–206.) Since Plaintiff's separation from employment with MHVS, the Home Health Care Department has hired 13 more employees, 9 of whom are over the age of 40 and 3 of whom are over the age of 60. (*Id.* ¶¶ 207–209.) The employee who replaced Plaintiff was 55 years old at the time of her hiring. (*id.* ¶ 210.)

As a Start of Care nurse, Plaintiff was tasked with going to patients' homes for an initial assessment of their health statistics, taking their history, and performing any patient care needed at the time. (*Id.* ¶ 12.) At a visit, the nurse enters the patient information into a computer, which can be later accessed by a nurse manager; Plaintiff contends that patient information from other sources is not included in this entry. (*Id.* ¶ 13; Pl.'s 56.1 ¶ 13.) At some point, Defendant required the Start of Care nurse to create a "Start of Care Plan" within the three day period following the assessment, although Plaintiff claims that this requirement was a later adopted change in protocol. (Pl.'s 56.1 ¶ 14.) The Start of Care nurse indicates in a report when the case manager nurse needs to see the patient, normally within 24–48 hours. (*Id.* ¶ 15.) Start of Care

nurses also must complete substantial paperwork, travel to patients' homes, carry various equipment, and be organized, disciplined, and detail-oriented, including accurately recording patient information. (Def.'s 56.1 ¶ 16.)

When Plaintiff joined the Home Health Care Department, she had three supervisors—Francis Trayvor, Lauretta Mahoney, and Linda Walker. (*Id.* ¶ 21.)[2] Mahoney was her direct supervisor. (*Id.* ¶ 22.) After WCHCC acquired St. Francis, Mahoney and Walker, both Nurse Managers responsible for overseeing patient care, including reviewing and accessing nurses' documentation, remained Plaintiff's supervisors. (*Id.* ¶¶ 23–24.) Walker was Plaintiff's direct supervisor until a few months before Plaintiff's separation from employment with Defendant, (*id.* ¶¶ 25, 33), although it is disputed whether this was for four years, (*id.* ¶ 27), or less than two years, from 2014 through January 2015, (Pl.'s 56.1 ¶¶ 26–27).[3] Walker was on leave from January 7, 2015 through March 18, 2015; during that time, Plaintiff was not assigned a specific supervisor, but Mahoney provided Plaintiff with assignments. (Def.'s 56.1 ¶ 31; Pl.'s 56.1 ¶ 31.) Defendant contends that Mahoney also interacted with Plaintiff regarding her assessments and plans for patient care, (Def.'s 56.1 ¶ 32), but Plaintiff claims she "had very little interaction with Mahoney," and did not interact with her regarding patient care plans, (Pl.'s 56.1 ¶ 32). Linda Lomangino, Manager of Clinical Services, directly supervised Walker and Mahoney. (Def.'s

---

[2] Plaintiff disputes this by claiming that her third line supervisor was Linda Rashba, and in 2005, she was not assigned a direct supervisor, but instead fell under the three supervisors who supervised the entire office. (Pl.'s 56.1 ¶ 21.) However, this denial is contradicted by Plaintiff's later admissions that Mahoney was her direct supervisor when she joined the Home Health Care Department, (*id.* ¶ 22), and that Mahoney and Walker "remained Plaintiff's supervisors" when WCHCC bought St. Francis, (*id.* ¶ 23).

[3] Plaintiff fails to respond whatsoever to Defendant's paragraph 25. (*See* Pl.'s 56.1 ¶ 25.) She also purports to dispute whether she was 67 years old when Walker began supervising her, but provides only dates of supervision rather than a different age. (*Id.* ¶ 26.)

56.1 ¶ 28.)  Barbara Good, the Administrator of the Home Health Care Department, was Lomangino's supervisor.  (*Id.* ¶¶ 29–30.)

MHVS employees must follow its policies and procedures.  (*Id.* ¶ 35.)  Plaintiff was aware of these policies and procedures and had access to them through a Human Resources policy book.  (*Id.* ¶¶ 37–38, 40.)  Defendant contends that it trained employees when it introduced new policies, (*id.* ¶ 39), but Plaintiff claims she was not provided any training with respect to these policies, including the anti-discrimination policies, (Pl.'s 56.1 ¶ 39).  It is undisputed, however, that Defendant had an anti-discrimination policy in 2014, as well as a detailed Protected Health Information policy which covered, among other things, protecting confidential patient information.  (Def.'s 56.1 ¶¶ 41–44.)  Plaintiff understood which actions would breach this policy, and the Health Insurance Portability and Accountability Act ("HIPAA"), Pub. L. No. 104–191, 110 Stat.1936 (Aug. 21, 1996), including revealing information to an unauthorized third party, and was aware of the requirement to report any such disclosure.  (*Id.* ¶¶ 45–46.)

Additionally, the MHVS "Principles of Conduct for All Staff" policy stated that Defendant "does not, and will not, tolerate any form of violation of HIPAA or confidentiality by" employees, and noted that violation of such policy may result in discipline, including termination.  (*Id.* ¶¶ 48–49.)  Plaintiff was aware of these requirements, including the proper safeguards for sending protected health information via internet or facsimile, and indeed completed multiple training sessions regarding HIPAA.  (*Id.* ¶¶ 50–52.)   However, Plaintiff claims she knew at that time that secretarial staff often faxed materials on behalf of nurses.  (Pl.'s 56.1 ¶ 53.)  Plaintiff also contends that HIPAA violations were routinely greeted with short suspensions or ignored completely; for example, Mahoney purportedly stated "corporate

compliance is not our friend and we don't do that anymore" in response to a nurse leaving confidential records in another patient's home, and a fifty-year-old case manager was not sanctioned when she left patient files in a library.  (*Id.* ¶¶ 48–49.)

Finally, Defendant has a disciplinary procedure setting forth the ways in, and reasons for, which an employee may be disciplined.  (Def.'s 56.1 ¶ 55.)  The policy states that Defendant has the right to administer discipline at its discretion.  (*Id.* ¶ 56.)  It also sets forth progressive discipline steps, which Defendant announced to its staff, but undisputedly clarifies that Defendant can issue discipline at whatever level it sees fit and need not follow the specific progressive order.  (*Id.* ¶¶ 58–59; Pl.'s 56.1 ¶¶ 56, 58–59.)  The policy permits disciplining employees for conduct Defendant deems unprofessional or in conflict with its standards, (Def.'s 56.1 ¶ 57), and, "in cases involving serious misconduct, or any time the supervisor determines it is necessary, such as a major breach of policy or violation of law, the progressive discipline steps may be skipped based on the severity of the infraction," (*id.* ¶ 60 (alterations and internal quotation marks omitted)).  However, the policy does provide that a supervisor is supposed to meet with an employee and give that employee an opportunity to explain his or her actions first when Defendant's performance standards are not being met.  (Pl.'s Counter 56.1 ¶ 88.)

### 2.  The Relevant Events

Beginning in 2012, Plaintiff spoke to Lomangino about Walker's supervision of Plaintiff.  (Def.'s 56.1 ¶ 62.)  Defendant claims that Plaintiff simply "didn't like" Walker, (*id.* ¶ 62), while Plaintiff claims that Walker asked her "Why don't you retire? When are you going to retire?" once a week or every other week during case reviews, and Plaintiff reported to Lomangino and HR that Walker was acting like a bully, (Pl.'s 56.1 ¶ 62).  However, in 2013, Plaintiff responded to her 2013 performance evaluation in writing to address her work environment, but did not

mention her age or contend that Walker's treatment was due to her age.  (Def.'s 56.1 ¶ 63.)

Specifically, Plaintiff claimed that Walker's treatment was antagonistic and punitive, and that

Walker did not exhibit such micro-management in her supervision of others; she did not,

however, focus on Walker's motivation at that time.  (Pl.'s 56.1 ¶ 63; Pl.'s Counter 56.1 ¶ 82.)

Plaintiff did not want to portray Walker as a "discriminator" when discussing this issue with

Walker's supervisors.  (Def.'s 56.1 ¶ 64.)  Defendant contends that ultimately, Plaintiff's

dissatisfaction was with Walker's micromanagement, not treatment based on Plaintiff's age,

pointing to Plaintiff's contention that Walker's style "has not been one of teaching [her] or

guiding [her] in the field."  (*Id.* ¶¶ 65–66.)  Plaintiff claims, however, that she saw the disparate

treatment afforded to younger employees and concluded that she was being treated this way

because Walker wanted her to retire.  (Pl.'s 56.1 ¶ 65.)  Nurse Carolyn Odell avers:

> I observed hostile behavior by . . . Walker toward [Plaintiff]; Walker would
> micromanage and pick on [Plaintiff] incessantly.  Many nurses talked about this
> and many felt uncomfortable about the treatment we all observed.
> In the same time period, I heard . . . Walker repeatedly make comments relating to
> [Plaintiff's] age, questioning when she would retire and making [Plaintiff]
> uncomfortable about her age.  This, again, was NOT isolated.  I heard it many times.

(Sussman Aff. Ex. 6 ("Odell Aff.") ¶¶ 2–3; *see also id.* ¶ 5 (rejecting Walker's denials).)

Plaintiff requested a different supervisor at some point during her employment.  (Def.'s

56.1 ¶ 67.)  Good and Lomangino determined there was no reason to make such a change, (*id.*

¶ 68), but Plaintiff contends that neither woman communicated this to Plaintiff, (Pl.'s 56.1 ¶ 68;

*but see* Pl.'s Counter 56.1 ¶¶ 34–37 (citing Sussman Aff. Ex. 13 ("Good Dep.") 35–36 (testifying

that she responded, but did not provide a reason))).  The Parties dispute whether Plaintiff told

Walker about her request to change supervisors, and Plaintiff argues that Walker responded "do

you think I want you as my subordinate?"  (*Compare* Def.'s 56.1 ¶ 69 *with* Pl.'s 56.1 ¶ 69.)

Plaintiff also claims that she told Human Resources, through Nancy Estremera, that Walker

repeatedly suggested she retire and was hostile and antagonistic, but was not told to file a formal complaint, and further, Estremera did not conduct any investigation after promising to do so. (Pl.'s 56.1 ¶¶ 64, 68; *see also* Def.'s 56.1 ¶ 71 (noting that Plaintiff never submitted a written complaint); *id.* ¶ 72 (noting that Vice President of Nursing Barbara Naru never received a complaint from Plaintiff); *see also* Pl.'s Counter 56.1 ¶¶ 73–74 (citing Estremera's denials that Plaintiff complained).)[4]

Both citing to Lomangino's deposition testimony, the Parties dispute whether Lomangino spoke with Walker beginning in 2012 regarding the need to spend time correcting Plaintiff's work. (*Compare* Def.'s 56.1 ¶ 73 *with* Pl.'s 56.1 ¶ 73; *see also* Sussman Aff. Ex. 16 ("Lomangino Dep.") 21–23 (testifying that she did not "remember" whether she ever spoke to Walker about Plaintiff, but then testifying that in a conversation with Walker, she remembered mentioning Walker's need to "spend a lot of time correcting [Plaintiff] . . . [and] her work").) The Parties further dispute whether Lomangino ever met with Plaintiff to discuss these issues. (*Compare* Def.'s 56.1 ¶ 74 *with* Pl.'s 56.1 ¶ 74; *see also* Lomangino Dep. 24 (testifying that she never sat in on the meetings between Plaintiff and Walker).) However, it is undisputed that Plaintiff had regular meetings with Walker to review Plaintiff's records and the errors in her documentation. (Def.'s 56.1 ¶ 75; Pl.'s 56.1 ¶ 75.)

In September 2014, Plaintiff received a "Competency Based" performance evaluation, which applied to all MHVS Registered Nurses. (Def.'s 56.1 ¶¶ 17–18.) Walker completed this evaluation as Plaintiff's supervisor, and reviewed it with Lomangino. (*Id.* ¶ 77.) The evaluation also contained a document for "coaching," which is used to encourage employees "to exceed as

_____

[4] It is undisputed that Estremera had no contact with Plaintiff until the described meeting. (Def.'s 56.1 ¶ 70.)

well as meet the standards of their job." (*Id.* ¶¶ 79–80.)  Walker noted in the evaluation that Plaintiff's "accurate and complete documentation" was under review, (*id.* ¶ 81), although Plaintiff denies the validity of this statement and attributes it to Walker's micromanagement, (Pl.'s 56.1 ¶ 81).[5]  Walker met with Plaintiff to discuss the results of the evaluation, and for coaching.  (Def.'s 56.1 ¶¶ 78, 82.)  Although Defendant claims Walker had follow-up coaching meetings with Plaintiff every couple of weeks until she went on leave, (*id.* ¶ 83), Plaintiff argues that Walker stopped these meetings at some point before she left, (Pl.'s 56.1 ¶ 83).

In 2014, Walker met with Lomangino and Good regarding Plaintiff's performance problems, (Def.'s 56.1 ¶ 84), although Plaintiff was not advised of such meeting or provided counseling or a corrective action document pursuant to Defendant's progressive disciplinary policy, (Pl.'s 56.1 ¶ 84).  It is disputed whether Walker, Lomangino, and Good ever met with Plaintiff to go over her documents.  (*Compare* Def.'s 56.1 ¶ 85 *with* Pl.'s 56.1 ¶ 85.)  Indeed, while Defendant claims Plaintiff's errors included charting the wrong patients in the wrong charts, failing to give timely reports to other nurses, and inaccuracies in documentation, (Def.'s 56.1 ¶ 86), Plaintiff claims that there is no documentation of such issues and that Walker set different standards for Plaintiff than for others, (Pl.'s 56.1 ¶ 86).

Before going on leave in January 2015, Walker spoke to Mahoney, who was to become Plaintiff's supervisor, about Plaintiff's performance, noting that she met with Plaintiff periodically.  (Def.'s 56.1 ¶ 87.)  Mahoney informed Walker that she would continue to meet with Plaintiff while Walker was on leave, (*id.* ¶ 88), although Plaintiff denies that such meetings

---

[5] One of the other duties and responsibilities listed in the evaluation was "performing nursing care consistent with policies and procedures of the agency and in accordance with established best practices."  (Def.'s 56.1 ¶ 19 (alteration omitted).)  This duty is important because it ensures patient safety and health.  (*Id.* ¶ 20.)

occurred, (Pl.'s 56.1 ¶ 88).  In the month prior to Plaintiff's separation from employment, she

attended a meeting at which several instances of patient care were discussed.  (Pl.'s 56.1 ¶ 89.)

However, the Parties dispute whether Plaintiff received other verbal warnings from Lomangino

regarding her performance, and whether Plaintiff had multiple recorded instances of policy

violations.  (*Compare id.* ¶¶ 89–90 *with* Def.'s 56.1 ¶¶ 89–90.)[6]  Specifically, Defendant points

to an incident on March 10, 2015, when Plaintiff failed to finalize a Start of Care plan for a

patient, delaying that patient's treatment and putting the patient's safety at risk.  (Def.'s 56.1

¶¶ 91–97.)  However, Plaintiff contends that Lomangino told her not to act on the patient's Start

of Care plan because the patient did not have covered insurance; furthermore, Plaintiff alleges

that she asked about it but was told to wait, and that it was not until later that Lomangino "blew

up" and said that Plaintiff should have followed up on it.  (Pl.'s 56.1 ¶¶ 91–97.)

Defendant also cites a March 11, 2015 incident when Plaintiff allegedly failed to correct

errors on a patient's chart following a directive from Mahoney to do so.  (Def.'s 56.1 ¶ 99.)

Plaintiff concedes that Mahoney spoke to Plaintiff about this patient's chart, (Pl.'s 56.1 ¶ 104),

but denies that there were errors, because she actually saw the patient and gathered the data, and

Mahoney did not, (*id.* ¶ 99).  Furthermore, Plaintiff admits that she did not want to follow

Mahoney's instructions to change the information on the chart, (Def.'s 56.1 ¶ 105), because she

knew that altering a chart with information she did not see or record might jeopardize her nursing

license, (Pl.'s 56.1 ¶ 105).[7]  Defendant further contends that, instead of complying with

---

[6] It is undisputed that failure to follow policy and "acts compromising the safety of patients" are infractions under Defendant's disciplinary policy.  (Def.'s 56.1 ¶ 98.)

[7] It is undisputed that MHVS employees were subject to discipline for failure to follow legitimate directives from a supervisor, and such discipline could include "termination of employment."  (Def.'s 56.1 ¶¶ 106–107.)  However, Plaintiff contends that Mahoney's instructions were not legitimate.  (Pl.'s 56.1 ¶¶ 106–107.)

Mahoney's instructions, Plaintiff instead insisted she was not on duty that day, which was belied by the daily activity sheets. (Def.'s 56.1 ¶ 108.) Plaintiff disputes this, claiming that she was out for several days with the flu in March 2015 and when confronted with the issue of changing this patient's chart, she queried whether she in fact was at work that day. (Pl.'s 56.1 ¶ 108.) However, it is undisputed that Plaintiff went into the patient's record to document that she was absent on the day in question to support her proffered excuse. (Def.'s 56.1 ¶ 110.) Plaintiff admits that entering non-patient information on a patient chart is inappropriate, (*id.* ¶ 111), although she believes it equally important to make entries clarifying who has or has not altered medical records, (Pl.'s 56.1 ¶ 111). It is undisputed that altering, falsifying, or making a willful misstatement on any patient's record is a policy infraction, (Def.'s 56.1 ¶ 112), but Plaintiff claims this is why she refused to comply with Mahoney's directive, (Pl.'s 56.1 ¶ 112).

On another occasion, Defendant contends that Plaintiff breached HIPAA by sending a fax with a patient's protected health information to an unauthorized third party. (Def.'s 56.1 ¶ 113.) Plaintiff never admitted to sending the fax. (Pl.'s 56.1 ¶ 113; *see also* Pl.'s Counter 56.1 ¶ 55 ("Good could not recall whether . . . [Plaintiff] stated that she had even sent the fax.").) The third-party informed the hospital it received the fax, and Good, not Plaintiff, informed the Office of Corporate Compliance, which was created to address rampant HIPAA violations at St. Francis and was responsible for recommending the appropriate disciplinary measures to take in response to such violations. (Def.'s 56.1 ¶¶ 114–18; *but see* Pl.'s Counter 56.1 ¶ 38 (citing Good's testimony that she did not recall seeing the fax before her deposition).) When determining its disciplinary recommendation, Corporate Compliance takes into account, among other things, the vulnerability of the organization and the patient; it also attempts to make recommendations ensuring fair and consistent discipline across the organization. (Def.'s 56.1 ¶¶ 119–21.)

Defendant contends that upon receiving a recommendation, Estremera would work with the employee's manager or supervisor to consider it and determine the proper counseling, (*id.* ¶ 124), while Plaintiff argues that HR's role was only to implement the recommendation without discussion, (Pl.'s 56.1 ¶ 124).[8]

On March 18, 2015, Plaintiff had a meeting with Estremera, Good, Senior Director of Compliance Valerie Campbell, and Cindy Kouhout, regarding the fax in question. (Def.'s 56.1 ¶ 129; *see also* Pl.'s Counter 56.1 ¶ 28.) Plaintiff was presented with a copy of the fax cover sheet, and she confirmed it was her handwriting on it. (Def.'s 56.1 ¶ 130.) The cover sheet also contained Plaintiff's recommendation for medical services for the patient. (*Id.* ¶ 132.) Plaintiff was informed that the fax was sent to the wrong business, (*id.* ¶ 131), but Plaintiff claimed this was the first time she learned this, (Pl.'s 56.1 ¶ 115). Plaintiff could not recall whether she sent the fax or whether a secretary sent it. (Def.'s 56.1 ¶¶ 133–34.) However, Plaintiff admitted that, had she known she sent the fax, she would have been required to report her mistake to a supervisor. (*Id.* ¶ 135.) It is undisputed that this fax breached HIPAA. (*Id.* ¶ 136.) Corporate Compliance recommended a five-day suspension for Plaintiff. (*Id.* ¶ 137; *see also id.* ¶ 160 (noting that this was "merely a *recommendation*").) Good did not conclude after the meeting that Plaintiff intentionally sent the fax to the wrong party. (Pl.'s Counter 56.1 ¶ 54.) Nor did Good have a discussion about terminating Plaintiff afterwards. (Def.'s 56.1 ¶¶ 56–57.) Defendant claims that Plaintiff had another violation after this purported breach, and thus was subject to termination as the next step after suspension, (*id.* ¶ 138), but Plaintiff disputes this, (Pl.'s 56.1 ¶ 138).

---

[8] The process by which Corporate Compliance investigates HIPAA violations is undisputed. (*See* Def.'s 56.1 ¶¶ 125–28.)

Finally, on March 25, 2015, Plaintiff allegedly documented a Start of Care plan in the wrong patient's medical chart.  (Def.'s 56.1 ¶ 139.)  Plaintiff admits that she accessed the wrong patient's medical chart while in her office before a patient visit, and that, at the visit, she temporarily entered her assessment form on the wrong patient's chart, but claims she deleted this information from the wrong chart and entered it on the correct chart once she returned to her office.  (Pl.'s 56.1 ¶ 139.)  However, a supervisor noted that the patient's chart still reflected the wrong patient's information with respect to medication after Plaintiff said she fixed the error, (Def.'s 56.1 ¶ 140), and Plaintiff testified that while she thought she did fix it, she may have made a mistake, (Clark Decl. Ex. D ("Pl.'s Dep.") 132).[9]  Mahoney advised Lomangino about the error, who in turn spoke to Plaintiff.  (Def.'s 56.1 ¶¶ 141–42.)[10]

Good composed a "timeline" dated April 7, 2015, in an effort to record Plaintiff's alleged multiple infractions in March 2015, based on the accounts of her supervisors.  (*Id.* ¶ 145; Clark Decl. Ex. S ("Timeline").)[11]  At her deposition, Good did not recall when she wrote the document or if she gave it to anyone, including Plaintiff.  (Pl.'s Counter 56.1 ¶¶ 39–45.)  Good also did not speak with Plaintiff or review any documents before composing at least the first paragraph, which relates to the March 10 incident with the patient follow-up.  (*Id.* ¶¶ 50–52.)  At

---

[9] To the extent Plaintiff is construing her affidavit to aver that she *conclusively* did not make such a mistake, (Aff. of Mary Hess (Dkt. No. 33) ¶ 33), it is inconsistent with her deposition testimony and will not be considered, *see Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony.").

[10] An employee can be disciplined for entering the wrong information on a patient's chart.  (*Id.* ¶ 144.)

[11] In addition to the documented events, Plaintiff admits she was warned by supervisors about spelling errors and confusing patient names.  (Def.'s 56.1 ¶ 146.)

some earlier point in 2015, Lomangino spoke with Good about Plaintiff's performance issues. (Def.'s 56.1 ¶ 150.) Defendant also claims that Lomangino spoke with Estremera about Plaintiff's performance problems on an unspecified date, (*id.* ¶ 151), and that Good spoke with Naru about them as well, (*id.* ¶ 152), but Plaintiff notes that Naru had only "a very vague recollection" about any such conversation with Good, (Pl.'s 56.1 ¶ 152).

Defendant alleges that it ultimately decided to terminate Plaintiff because of the incidents discussed above. (Def.'s 56.1 ¶ 153.) Plaintiff claims she was not told why she was terminated and received no written document or final warning. (Pl.'s 56.1 ¶ 153.) Plaintiff also received no written counseling for any performance related issue in January, March, or April 2015 as per the progressive disciplinary policy. (Pl.'s Counter 56.1 ¶¶ 20–21, 23, 26.) Indeed, at the time of her termination, Plaintiff had no outstanding discipline in her file from the previous year; the last one was dated August 22, 2013, for an incident before Defendant acquired St. Francis. (*Id.* ¶¶ 17–19.) Plaintiff was shown the documentation of her alleged errors, and informed of these errors, (Def.'s 56.1 ¶¶ 154–55), but disputes the validity of these errors, noting that supervisors did not tell her she violated any policy, (Pl.'s 56.1 ¶¶ 154–55). The Parties dispute whether Plaintiff failed to show accountability for her actions. (*Compare* Def.'s 56.1 ¶ 156 *with* Pl.'s 56.1 ¶ 156.)

It is not entirely clear who made the ultimate decision to fire Plaintiff. (*E.g.*, Def.'s 56.1 ¶ 172; Pl.'s 56.1 ¶ 172.) Defendant contends that the decision to terminate Plaintiff was made through communications between Good, Naru, and Estremera, not Walker and Lomangino. (Def.'s 56.1 ¶ 157.) Good testified that she never proposed or sought Plaintiff's termination, (Pl.'s 56.1 ¶ 145; Pl.'s Counter 56.1 ¶ 16; *see also id.* ¶ 58 ("Good does not know who suggested terminating [Plaintiff].")), but that she did actually terminate Plaintiff, "in concert with" Naru and Estremera, although without any formal meeting between the three of them, (Good Dep. 16,

18). Estremera similarly testified that there were no formal meetings, but she discussed Plaintiff's "several" performance issues with Good and had "several" phone calls in March 2015 discussing Hess's termination. (Sussman Aff. Ex. 18 ("Estremera Dep.") 28–30; *see also* Def.'s 56.1 ¶ 176 (noting that no one recommended termination, including Estremera, prior to March 2015).) Indeed, Estermera testified that the termination decision was not her decision; rather, "there was a larger conversation, because all of the [performance] things were coming together at the same time, in terms of how to discipline," and that she and Good decided to "collectively take everything together as a whole," and then Good would take that to Naru "to discuss termination." (Estremera Dep. 37–38; *see also* Pl.'s Counter 56.1 ¶¶ 4, 59.)[12] Estremera never spoke with Plaintiff about these issues, nor did she see the April 7, 2015 timeline prepared by Good before the date of her firing. (Pl.'s Counter 56.1 ¶¶ 69–71.)

Good claims she spoke with Naru about Plaintiff's termination, both "[b]efore and after" she spoke to Estremera, and that she "shared the information that [she] had discussed with . . . Estremera," including "[t]he recommendations of her termination." (Good Dep. 19–20.) Naru, however, remembers speaking with Good about Plaintiff, but has only "a very vague recollection" about "some performance issues . . . related to a HIPAA violation." (Sussman Aff. Ex. 12 ("Naru Dep.") 12–14.) Naru does not remember any advice she gave to Good regarding Plaintiff, and does not recall Good asking Naru if Good could terminate Plaintiff. (*Id.* at 16–17.) At the time of this conversation, Good no longer directly reported to Naru, but Naru had "some overall responsibility for all of the nurses" employed by Defendant, "regardless of whether they

---

[12] Plaintiff claims that Estremera "denied that she had any such contact with Good, claiming that she had told Good to speak with Naru about [Plaintiff] and was not involved in [P]laintiff's termination," (Pl.'s 56.1 ¶ 150; *see also id.* ¶ 174), but this is not supported by Estremera's deposition testimony, (Estremera Dep. 37–38).

reported directly to [her] or not." (*Id.* at 12–15.) Naru "was involved in, but not the ultimate decision maker" in decisions to hire and fire nurses at that time; the ultimate decision maker was Patricia Roble. (*Id.* at 15–16.)[13] Naru did not speak with Roble or direct Good to Roble; she also did not believe that Good spoke with Roble. (*Id.* at 16.)

Plaintiff testified that she did not know who made the decision to fire her. (Pl.'s Dep. 191, 249.) However, Plaintiff argues that Lomangino was the source of nearly all of the information in the timeline of incidents Defendant relied upon to fire her, and Good never discussed these issues, except HIPAA, with Plaintiff. (Pl.'s 56.1 ¶ 157; *see also* Pl.'s Counter 56.1 ¶¶ 49, 53 (alleging that Good received timeline information from Mahoney and Lomangino).) Lomangino claims to have never discussed terminating Plaintiff with Good, and indeed, on April 7, 2015, Lomangino gave Hess an assignment, and only then did Good tell her that HR had "said to terminate" Plaintiff. (Pl.'s 56.1 ¶ 150; Def.'s 56.1 ¶¶ 158, 174; *see also* Lomangino Dep. 34–35.) Similarly, Walker never made such a recommendation, or sought any discipline, after August 2013, (Pl.'s 56.1 ¶ 146; *see also* Def.'s 56.1 ¶ 175 (stating that Walker did not discuss or recommend Plaintiff's termination, nor was she aware of the March 2015 HIPAA breach or others' efforts to terminate Plaintiff prior to April 7, 2015)), and Mahoney did not either, (Pl.'s 56.1 ¶ 149; Def's 56.1 ¶ 173). At the time of all of these events, Walker was 63 years old, Lomangino was 50 years old, Good was 63 years old, Naru was 61 years old, and Estremera was 49 years old. (Def.'s 56.1 ¶ 177.)

---

[13] To the extent that Plaintiff represents Naru's testimony as stating that she definitively "had no discussions concerning" Plaintiff's termination, (Pl.'s 56.1 ¶ 150; *see also* Pl.'s Counter 56.1 ¶ 12), this is misleading; rather, Naru testified that she does not remember any advice she gave to Good about Plaintiff or Good asking if she could terminate Plaintiff, (Naru Dep. 16–17).

On April 7, 2015, Plaintiff met with Good and Lomangino. (Def.'s 56.1 ¶ 163.) At that meeting, Good told Plaintiff that she was terminated, (*id.* ¶ 164), although Plaintiff contends she was not told *why*, (Pl.'s 56.1 ¶ 164; Pl.'s Dep. 182-84, 217). Neither Good nor Lomangino mentioned Plaintiff's age during this meeting. (Def.'s 56.1 ¶ 165.) In fact, Lomangino did not speak, (*id.* ¶ 166), although she started to say something but was cut off by Good, (Pl.'s Dep. 182–83). Good discussed the option of resigning with Plaintiff, although the Parties dispute whether Good offered Plaintiff that option or whether she merely said she could convince the Vice President of Human Resources to sign off on Plaintiff's receipt of unemployment benefits if she resigned. (*Compare* Def.'s 56.1 ¶ 167 *with* Pl.'s 56.1 ¶ 167.)[14] Plaintiff called Good that day to say she would resign. (Def.'s 56.1 ¶ 169.) Plaintiff called back immediately to rescind this decision, (Pl.'s 56.1 ¶ 170), although Good did not mention this to Lomangino, (Def.'s 56.1 ¶ 170). Thus, Plaintiff's Employee Change form at the end of her employment lists both resignation by telephone and termination as reasons for her separation from employment. (Def.'s 56.1 ¶ 171; Pl.'s 56.1 ¶ 171.) However, Defendant argued in the later EEOC and litigation proceedings that Plaintiff resigned. (Pl.'s Counter 56.1 ¶¶ 78–79.)

Plaintiff alleges that her termination was based on age discrimination for several reasons. At her deposition, Plaintiff testified as follows:

Q: No one said you were being allegedly terminated because of your age?
A: I didn't know why I was being -- no.
Q: You didn't know why you were being terminated; is that correct?
A: Yes.

---

[14] Plaintiff contends that Estremera knew, as a long-time HR professional, that a resigning employee cannot receive unemployment benefits in New York, (Pl.'s Counter 56.1 ¶ 75), but she also claims that Estremera had no knowledge that Good spoke with Plaintiff, (*id.* ¶¶ 68, 77), and that HR did not authorize Good to tell Plaintiff she could receive these benefits if she resigned, (*id.* ¶ 76). In any event, Estermera was not at the meeting. It is therefore unclear how this fact is material.

Q: So aside from these statements that Ms. Lomangino made to other employees and the comments Ms. Walker made to you about retirement, what else makes you think you were terminated because of your age?

A: Ms. Lomangino would say things like, you need to do this and this and this, do you understand? Are you able to understand?

Q: And what makes you think that has to do with your age?

A: Well, other than being retarded, I guess that's what she was implying.

Q: So you're just assuming that had to do with your age?

A: I'm sure.

Q: Again, though, why do you think -- what do think these comments had to do with your termination?

A: I don't know what to say to you. I don't know how to answer you any plainer than I have.

(Pl.'s Dep. 198–200 (objections omitted).)

Plaintiff also claims that Walker repeatedly suggested that Plaintiff consider retiring, (Def.'s 56.1 ¶ 182), including, on one occasion in Fall 2014, asking Plaintiff to retire and take unrelated per diem work after she returned from ankle surgery affecting her ability to walk, (*id.* ¶ 184; Pl.'s 56.1 ¶ 184). The Parties dispute whether Walker said this out of genuine concern over Plaintiff's ability to perform job functions, including walking up stairs and carrying equipment, (Def.'s 56.1 ¶ 185), or whether it was part of Walker's continued theme of insisting Plaintiff retire because she was too old to perform the work, (Pl.'s 56.1 ¶ 185). They also dispute whether Plaintiff responded, and whether Walker ever made any comments about retirement generally. (*Compare* Def.'s 56.1 ¶¶ 183, 186 *with* Pl.'s 56.1 ¶¶ 183, 186.) Walker became Plaintiff's supervisor when Plaintiff was already 67 years old, (Def.'s 56.1 ¶ 187), and, at her deposition, Plaintiff testified that she did not know why Walker would not terminate her or have animus towards her at 67, but would at 70 or 71, (Pl.'s Dep. 236–37).[15] However, Plaintiff also

---

[15] Plaintiff attempts to dispute this fact by averring "Walker always treated me in an antagonistic and disparate manner" in her affidavit. (Pl.'s 56.1 ¶ 188 (quoting Pl.'s Aff. ¶ 37).) To the extent this contradicts her deposition testimony, the Court will not consider it. But, in any event, this conclusory statement does not contradict the fact that Walker did not cause or recommend Plaintiff's termination when she was 67, but allegedly did at 70 or 71.

claims that Defendant's failure to act on her complaints of age discrimination against Walker is further evidence that her termination was age-related. (Pl.'s 56.1 ¶ 181.)

Additionally, Plaintiff claims that Lomangino said to Nancy Scalzo, another Start of Care nurse, that another nurse, Phyllis Newman, was "getting too old, like [Plaintiff]. [Plaintiff] was losing it too." (Def.'s 56.1 ¶ 189; Sussman Aff. Ex. 7 ("Scalzo Aff.") ¶¶ 7–8.) Lomangino made this alleged comment four months after Plaintiff left MHVS and was no longer employed by Defendant. (Def.'s 56.1 ¶¶ 191–92.) Lomangino denies making this statement. (*Id.* ¶ 190.) Plaintiff did not hear the alleged comment directly. (*Id.* ¶ 193.) Lomangino never made any direct comments to Plaintiff about her age. (*Id.* ¶ 194.)[16] However, Odell averred that:

> [She] also heard . . . Lomongino similarly ask [Plaintiff] when she was going to retire and suggest that she was too old to continue working. The attitude projected by Walker and Lomongino was in stark contrast to the feelings of other nurses and colleagues who often called upon [Plaintiff] for guidance and advice due to her knowledge, skills and abilities as a nurse.

(Odell Aff. ¶ 4.)

Since MHVS' inception, other nurses in the home Health Care Department have breached HIPAA and been disciplined for the violation, (Def.'s 56.1 ¶ 198), although Plaintiff contends that no other employees have been terminated for a first violation, and that three to five day suspensions are the norm in those instances, (Pl.'s 56.1 ¶ 198). Plaintiff claims that other, younger registered nurses were not met with the same draconian consequences as she was for

---

[16] Defendant contends that Plaintiff also has no direct knowledge of Lomangino making comments about Plaintiff's age to any others during her employment at MHVS, but the cited deposition testimony states only that Plaintiff has no direct knowledge of comments made "directly to [Plaintiff]." (Def.'s 56.1 ¶ 195 (citing Pl.'s Dep. 245).) Plaintiff disputes this by claiming Odell advised her of the comments she heard Lomangino make, but the cited affidavit paragraph—or, indeed, any paragraph—does not support this proposition. (Pl.'s 56.1 ¶ 195 (citing Pl.'s Aff. ¶ 28).) However, Odell did aver that *she* heard these comments. (Odell Aff. ¶ 4.)

HIPAA breaches. (*Id.* ¶ 199.) Specifically, she identifies Richard Hare, Bill Laux, Sharon

Sloan, and Joanna Nardo; however, a review of MHVS personnel records shows that Hare and

Sloan have no record of employment with MHVS and the other three individuals have no record

of any HIPAA violation. (Def.'s 56.1 ¶ 200.) Defendant contends that there are only two other

employees who had a record of a HIPAA violation while Plaintiff was employed, and they

received discipline commensurate with their disciplinary history—that is, a first written warning

and a suspension, respectively. (*Id.* ¶ 201 (citing Clark Decl. Ex. C ("Estremera Decl.") ¶ 17).)

By contrast, Plaintiff claims that there were "scores" of HIPAA violations by other employees.

(Pl.'s 56.1 ¶ 201 (citing Sussman Aff. Ex. 19 ("Campbell Dep.") 7–8.) For example, Good

testified that in her unit, over the eight years she was an administrator, someone incorrectly sent

information to the wrong party "[s]everal times a year," including a nurse, Sinon, who was not

terminated, and Scalzo, who faxed information to the wrong party and was suspended for five

days; both of these women were in their 40s or early 50s. (Good Dep. 23–26.)

B.  Procedural History

In June 2015, Plaintiff filed a discrimination charge with the Equal Employment

Opportunity Commission alleging that Defendant terminated her because of her age. (Def.'s

56.1 ¶ 179.) After receiving no response, Plaintiff filed the Complaint on February 16, 2016.

(*Id.* ¶ 180; Compl.) Defendant filed an Answer on April 4, 2016. (Answer (Dkt. No. 9).)

Mediation was held but unsuccessful. (Dkt. Nos. 11, 15.) The Court held a conference on April

5, 2017 and set a discovery schedule. (*See* Dkt. (entry for April 5, 2017).) On June 28, 2017,

Defendant filed a pre-motion letter indicating the grounds on which it would move for summary

judgment. (Letter from Brian J. Clark, Esq. to Court (June 28, 2017) (Dkt. No. 21)). Plaintiff

responded on July 8, 2017. (Letter from Michael H. Sussman, Esq. to Court (July 8, 2017) (Dkt.

No. 22)).  The Court held a pre-motion conference on July 18, 2017 and adopted a briefing schedule.  (Dkt. No. 24.)

Defendant filed the instant Motion for Summary Judgment and accompanying papers on September 18, 2017.  (Not. of Mot; Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (Dkt. No. 27); Clark Decl.; Def.'s 56.1.)  Plaintiff filed an opposition and accompanying papers on October 17, 2017.  (Pl.'s Opp'n to Mot. for Summ. J. ("Pl.'s Mem.") (Dkt. No. 32); Aff. Of Mary Hess ("Hess Aff.") (Dkt. No. 33); Sussman Aff.; Pl.'s 56.1.)  Defendant filed a reply on November 7, 2017.  (Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Reply") (Dkt. No. 36).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

 "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). Indeed, "[w]hile summary judgment must be granted with caution in employment discrimination actions, . . . 'a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment.'" *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (citations and some internal quotation marks omitted) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a

court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

### B. Analysis

Plaintiff claims that Defendant violated the ADEA by terminating her because of her age. (*See generally* Compl.) *See* 29 U.S.C. § 623(a)(1) ("It shall be unlawful for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."). This claim is analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (noting that the Second Circuit "remain[s] bound by . . . the burden-shifting framework [from *McDonnell Douglas*] for ADEA cases").

> Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination.

*Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014). However, for ADEA claims, at the third step, a plaintiff must show that the discriminatory motive "was a but for cause of" the

adverse employment action, rather than merely a motivating factor. *McCormack v. IBM*, 145 F. Supp. 3d 258, 266 (S.D.N.Y. 2015) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 173 (2009)).[17]

Defendant argues that it is entitled to summary judgment because Plaintiff failed to raise a dispute of material fact as to her prima facie case or, alternatively, as to pretext. (Def.'s Mem. 14–25.) For the purposes of this Motion, the Court will assume that Plaintiff satisfied her prima facie burden. *See Gorzynski*, 596 F.3d at 107 (describing elements of prima facie case).

Defendant provided a legitimate, non-discriminatory reason for terminating Plaintiff: her poor performance, as encapsulated by the incidents described earlier, in a concentrated period of time, which threatened patient safety and confidentiality and violated Defendant's policies. (Def.'s Mem. 18–20.) *See Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) (finding that the defendant "satisfied its burden of production by proffering a veritable arsenal of undisputed, documented examples of [the plaintiff's] inappropriate actions at work," which demonstrated its "honest belief that her job performance did not measure up to that required"); *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 106–07 (S.D.N.Y. 2009) ("[The defendant] has offered a legitimate, non-discriminatory reason for its decision to terminate [the plaintiff's] employment: it believed that she had engaged in 'misconduct' . . . by leaving a post-surgical patient unattended during a one-to-one care assignment and by placing a patient's food tray on the floor, and decided that this misconduct warranted termination in light of earlier disciplinary incidents and warnings."); *D'Cunha v. New York Hosp. Med. Ctr. of Queens*, No. 02-CV-5445, 2006 WL 544470, at *7 (E.D.N.Y. Mar. 6, 2006) ("The defendant provides a legitimate

---

[17] Plaintiff cites the old, pre-*Gross* pretext test, which required only that age motivated the employer's decision. (*See* Pl.'s Mem. 10, 18–21.)

explanation for [the] plaintiff's transfer by stating that the decision was based upon plaintiff's 'total work record,' which raised serious concerns for patient safety.").  Therefore, to defeat summary judgment, Plaintiff must create a dispute of fact regarding whether Defendant's proffered non-discriminatory reasons for terminating her are pretextual—in other words, that "but for" Plaintiff's age, Defendant would not have terminated her.  *See Gorzynski*, 596 F.3d at 106 (requiring an ADEA plaintiff to prove "that age was the 'but-for' cause of the challenged adverse employment action" (quoting *Gross*, 557 U.S. at 180)).  Plaintiff has not met this standard.

Plaintiff first argues that she offered "direct evidence of ageism" through the comments of Walker and Lomangino and through Estremera's failure to investigate on behalf of Human Resources.  (Pl.'s Mem. 18–19; *see also id.* at 12–17 (in prima facie context).)  Viewing the record in the light most favorable to Plaintiff, Walker and Lomangino both made repeated comments to and about Plaintiff regarding her retirement, *suggesting* she was too old to continue working.  (Pl.'s 56.1 ¶ 62 (Walker asking "Why don't you retire? When are you going to retire?" weekly or bi-weekly); Odell Aff. ¶ 3 ("Walker repeatedly made comments relating to [Plaintiff's] age, questioning when she would retire and making [Plaintiff] uncomfortable about her age.  This, again was NOT isolated.  I heard it many times."); *id.* ¶ 4 ("I also heard . . . Lomongino similarly ask [Plaintiff] when she was going to retire and suggest that she was too old to continue working.").)  However, "courts have consistently held that remarks relating to retirement . . .  are insufficient to defeat a motion for summary judgment in an ADEA case." *Fried v. LVI Servs., Inc.*, No. 10-CV-9308, 2011 WL 4633985, at *9 (S.D.N.Y. Oct. 4, 2011), *aff'd*, 500 F. App'x 39 (2d Cir. 2012); *see also Hamilton v. Mount Sinai Hosp.*, 528 F. Supp. 2d 431, 447 (S.D.N.Y. 2007) (explaining that "discussion of retirement is common in offices, even

between supervisors and employees, and is typically unrelated to age discrimination," and "a plaintiff should not be able to rely on . . . inquiries [into retirement plans of employees] to prove intentional discrimination"), *aff'd*, 331 F. App'x 874 (2d Cir. 2009). Indeed, the Supreme Court has explained that just because a characteristic or factor in an employer's decision is "correlated with age" does not necessarily make it discriminatory based on age. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993); *see also Rodriguez v. Pierre New York*, 299 F. Supp. 2d 214, 218 (S.D.N.Y. 2004) ("Assuming these factors are even correlated with age, that fact, without more, does not amount to a claim of age discrimination." (italics omitted)).[18]

Such references to retire may, however, demonstrate pretext when combined with "other indicia of an improper animus." *Hamilton*, 528 F. Supp. 2d at 447. Plaintiff fails to make such a showing here. Although she points to evidence that Walker repeatedly micromanaged her work and publicly humiliated her, (Pl.'s Mem. 13; Pl.'s 56.1 ¶ 63; Odell Aff ¶ 2), there is no evidence that these actions were based on Plaintiff's *age*. Similarly, even considering the incident in which Lomangino told Plaintiff not to finalize the Start of Care plan for a patient and then "blew up" at her when she did not follow up on it, (Pl.'s 56.1 ¶¶ 91–97), this event involved no indicia of age-based animus. Nor could a reasonable juror infer age based animus from Lomangino's (or Human Resources') decision not to further investigate Plaintiff's 2013 complaint about Walker acting like a bully, as it is undisputed that Plaintiff did not mention her age or age

<hr/>

[18] Although Plaintiff does not make this argument in her counseled opposition, she *could* argue that Odell herself makes a connection between the retirement comments and Plaintiff's age when she avers that Lomangino would "ask [Plaintiff] when she was going to retire and *suggest* that she was too old to continue working." (Odell Aff. ¶ 4.) However, this subjective testimony is alone insufficient to show but-for causation. *See Romain v. Great Expressions Dental of N.Y. LLP*, No. 16-CV-1966, 2018 WL 3542858, at *13 (S.D.N.Y. July 20, 2018) (finding "testimony . . . based on [another employee's] 'impression'" was "not sufficient to show but-for causation" and collecting cases so holding).

discrimination, and did not want to portray Walker as a "discriminator." (Pl.'s 56.1 ¶ 62; Def.'s 56.1 ¶¶ 63–64.) By contrast, in the case cited by Plaintiff, another employee said "Your bones are getting old. . . . you have the age. Why don't you get out," in addition to others "comment[ing] that [the] plaintiff had the requisite age . . . and ask[ing] her why she did not retire." *Nakis v. Potter*, 422 F. Supp. 2d 398, 404 (S.D.N.Y. 2006); *see also Hamilton*, 528 F. Supp. 2d at 447–48 (collecting cases holding that "even direct references to a plaintiff's age are not necessarily indicative of discrimination").[19] Put differently, while Plaintiff could have perhaps brought a claim for a hostile work environment based on this conduct, she did not; instead, she brought a claim for discriminatory termination. *See, e.g.*, *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 240–41 (2d Cir. 2007) (describing standards for hostile work environment claim under the ADEA). (*See* Pl.'s Mem. 15 (describing an "environment in which [Plaintiff] was repeatedly made to feel uncomfortable by two managers who repeatedly made ageist comments . . . ").)

There is, however, one comment by Lomangino that bears independent discussion. Scalzo, another nurse, avers that she had a conversation with Lomangino on July 30, 2015 regarding Plaintiff, in which the two women "were discussing per-diem nurses giving or . . . not giving reports to Case Manager Nurses." (Scalzo Aff. ¶ 6.) Lomangino said that:

> Phyllis [Newman] has been told over and over again about giving reports. I told [Good] that I did not want Phyllis doing so many medical visits. She's losing it. She's getting too old, like [Plaintiff]. [Plaintiff] was losing it too."

---

[19] Plaintiff cites two race discrimination cases, but they are inapplicable to Plaintiff's ADEA claim and involved clear discriminatory animus. *See Abrams*, 764 F.3d at 252–53 (finding that comments about whether the plaintiff "fit in" raised a fact question as to pretext for race discrimination); *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225–26 (2d Cir. 2014) (noting several incidents from which a jury could infer racial discrimination, including comments that African-American officers "don't know how to police each other," that the office "could lighten up a bit," and "how white was better than color").

(*Id.* ¶ 8.)  Plaintiff argues that this statement shows Lomangino's animus, and thus indicates that

her termination was because of her age.  (Pl.'s Mem. 16.)  However, this comment is nothing

more than a "'stray remark[],'" which, "'even if made by a decisionmaker, do[es] not constitute

sufficient evidence to make out a case of employment discrimination'" under the ADEA.

*Parron v. Herbert*, No. 17-CV-3848, 2018 WL 2538221, at *9 (alteration omitted) (quoting

*Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1996)); *see also Boyle v. McCann-

Erickson, Inc.*, 949 F. Supp. 1095, 1101 (S.D.N.Y. 1997) (noting that "ageist statements. . . are

not sufficient to satisfy [the] [p]laintiff's ultimate burden").

As Plaintiff concedes, (Pl.'s Mem. 15), the Second Circuit considers four factors when

determining whether a stray remark is probative of discriminatory intent:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-
> worker); (2) when the remark was made in relation to the employment decision at
> issue; (3) the content of the remark (i.e., whether a reasonable juror could view the
> remark as discriminatory); and (4) the context in which the remark was made (i.e.,
> whether it was related to the decision-making process).

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).  Even assuming Lomangino's

comment satisfied the first and third factors, it does not satisfy the remaining ones.  Lomangino

made this statement four months after Plaintiff's termination.  (Def.'s 56.1 ¶¶ 191–92.)  *See, e.g.*,

*Sethi v. Narod*, 12 F. Supp. 3d 505, 540 (E.D.N.Y. 2014) ("District courts in this Circuit have

found that a three-month lapse between alleged discriminatory statements and an adverse

employment action is too long a gap to find the remark probative of discrimination.").[20]  And,

this comment was made in the context of a conversation about per-diem nurses not giving reports

---

[20] Walker's retirement comments and treatment of Plaintiff, even assuming they were
discriminatory, are also insufficient to show pretext for the same reason: they all occurred before
January 7, 2015, when Walker went on leave and never returned as Plaintiff's supervisor.
(Def.'s 56.1 ¶¶ 31, 33.)  That is, they occurred three months before Plaintiff's termination.

to Case Manager nurses and Phyllis doing fewer medical visits.  (Scalzo Aff. ¶ 6.)  It was *not* a conversation about termination on this basis, let alone the termination of Plaintiff or potential termination of Phyllis.  Absent even a reference to Plaintiff's termination, this is simply a comment, albeit an insensitive one, about Plaintiff's mental state.  *See Luka v. Bard Coll.*, 263 F. Supp. 3d 478, 487–88 (S.D.N.Y. 2017) ("[T]he alleged remark was neither made close in time to the decision nor in relation to the specific employment decision challenged."); *Nidzon v. Konica Minolta Bus. Sols., USA, Inc.*, 752 F. Supp. 2d 336, 351 (S.D.N.Y. 2010) (noting that the speaker "was not the final or sole decisionmaker" and "[t]he comment was not related to the decision to terminate").

Moreover, to the extent that Lomangino's comment does permit the inference that Plaintiff was fired because she's "losing it," this means she was terminated for that characteristic, not because of her age.  *See, e.g.*, *Parron*, 2018 WL 2538221, at *7 ("While a person's memory or cognitive abilities may be correlated or empirically intertwined with age, a decision to terminate [the] [p]laintiff based on those abilities would be one motivated by some feature other than [the] [p]laintiff's age and, as such, would not violate the ADEA." (alterations and internal quotation marks omitted)); *see also Hazen Paper Co.*, 507 U.S. at 611 (holding that just because a characteristic is "correlated with age" does not necessarily make it discriminatory based on age); *Criley v. Delta Air Lines, Inc.*, 119 F.3d 102, 105 (2d Cir. 1997) (concluding that comments by employer indicating it was concerned about hiring pilots approaching the mandatory retirement age did not show age discrimination, because "employment decisions driven by factors that are empirically intertwined with age are not discriminatory so long as they are motivated by some feature other than the employee's age").  Put differently, the mere reference to Plaintiff's age causing her memory problems does not mean Defendant's concerns

about her memory loss were ageist; rather, these concerns were tied to Plaintiff's ability to do her job, which required organization and attention to detail. This cannot show that Plaintiff's age was the but-for cause of her termination. *See Meiri*, 759 F.2d at 997 (listing "honest belief that [a plaintiff's] job performance simply did not measure up to that required" as a legitimate, non-discriminatory rationale); *Kolesnikow*, 622 F. Supp. 2d at 106–07 (finding termination non-discriminatory when the healthcare employee "engaged in 'misconduct'" despite earlier incidents and warnings); *D'Cunha*, 2006 WL 544470, at *7 (upholding termination when the plaintiff's record "raised serious concerns for patient safety").

In any event, even assuming that Walker's and Lomangino's comments were discriminatory and their actions were motivated by ageism, it is undisputed that these individuals did not recommend Plaintiff's termination, nor were they involved in the decision to terminate Plaintiff. (Def.'s 56.1 ¶¶ 158, 174, 175; Pl.'s 56.1 ¶¶ 146, 150.) Indeed, Plaintiff relies on the fact that "her own supervisors did not seek her termination, did not seek to discipline her and provided her a standard assignment the day she was terminated," as evidence that Plaintiff was qualified for the job. (Pl.'s Mem. 12.) Thus, the rule that "[s]tatements by non-decisionmakers are not sufficient to show pretext" applies here. *Muhleisen v. Wear Me Apparel LLC*, 644 F. Supp. 2d 375, 388 (S.D.N.Y. 2009); *see also De la Cruz v. City of New York*, 783 F. Supp. 2d 622, 643 (S.D.N.Y. 2011) (same and collecting cases so holding).[21]

---

[21] Plaintiff claims that Defendant "has been unable to explain how . . .[P]laintiff was terminated and who made the decision." (Pl.'s Mem. 18.) This is inaccurate. Defendant cites the testimony of Good and Estremera to demonstrate that they discussed Plaintiff's performance issues in totality and termination as the appropriate discipline. (Good. Dep. 16; Estremera Dep. 28–30, 37–38.) That Naru remembers only talking to Good about Plaintiff but does not remember explicitly discussing termination does not mean it did not happen, or that these three individuals were not involved in the discussion. (Naru Dep. 12–17.) *See Faruki v. City of N.Y.*, No. 10-CV-9614, 2012 WL 1085533, at *5 (S.D.N.Y. Mar. 30, 2012) (holding that "there is no genuine dispute" where an individual testifies that she "did not recall" a particular occurrence

To overcome this hurdle, Plaintiff argues, without record citations, that Lomangino was the source of most of the erroneous information in Good's timeline of errors that Defendant relied upon in firing her, and therefore her age bias infected the decisionmaking process. (Pl.'s Mem. 14, 16, 19.) The record does not support this argument. First, there is zero evidence to support Plaintiff's allegations that Lomangino "fabricated" evidence against her that was input into Good's timeline. (*Cf. id.* at 14.)[22] Plaintiff cites Good's testimony that Lomangino provided the information about the incidents documented in the first and last paragraphs of the timeline, and that she may have also provided the information in the second paragraph. (Pl.'s 56.1 ¶ 157; Pl.'s Counter 56.1 ¶¶ 49, 53 (all citing Good Dep. 47–50, 57).)[23] This testimony does not refute, nor does any other testimony refute, that the incidents in question occurred— namely, that Plaintiff failed to follow up on patient paperwork on March 10, 2015; there were errors and omissions in a patient's chart the next day, including an inappropriate notation that Plaintiff was not on duty; and that on March 25, 2015, Plaintiff documented Start of Care information on the wrong patient's record, including medication information. (Timeline.) *See*

---

that others testified to). It is undisputed that Plaintiff was informed she was terminated by Good at a meeting on April 7, 2015. (Def.'s 56.1 ¶¶ 163–64.) Further, Plaintiff concedes that the other purportedly discriminatory actors did not recommend termination, making it difficult to conceive of how any confusion over who decided to terminate her can *aid* Plaintiff's discrimination claim. (Pl.'s 56.1 ¶¶ 146, 150.)

[22] To the extent Plaintiff is asking the Court to determine that Lomangino's testimony is not credible, this is not appropriate at the summary judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (explaining that a court should not make "[c]redibility determinations" when "ruling on a motion for summary judgment").

[23] Good also testified that the information in the second paragraph came at least in part from Mahoney. (Good Dep. 49–50.) Mahoney was not involved in the decision to terminate Plaintiff, and there are no allegations she did or said anything discriminatory. (Def.'s 56.1 ¶ 173.) And, Good herself participated in the meeting where Plaintiff was confronted about the HIPAA violation, also listed in the timeline, belying Plaintiff's claim that all the reasons for her firing came from Lomangino. (Timeline; Def.'s 56.1 ¶ 129.)

*St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 314 (E.D.N.Y. 2014) (finding no pretext because, although the "[p]laintiff claims that [his employers] fabricated the documents that gave rise to his fraud charges," he "has no evidence on which to base this speculation" and instead "asks the [c]ourt to make several assumptions without any evidence to support them"); *see also Rubinow v. Boehringer Ingelheim Pharm., Inc.*, 496 F. App'x 117, 119 (2d Cir. 2012) (rejecting the plaintiff's pretext argument that allegations against her were "fabricated" because "she d[id] not fundamentally dispute the specific accounts of her insubordination which led to her termination"). Rather, Plaintiff provides her own version of events and disagrees with her supervisors' instructions or interpretations of her actions. (*E.g.*, Pl.'s Mem. 14 (disputing paperwork incident); Pl.'s 56.1 ¶¶ 99, 105, 108 (denying Mahoney's interpretation of the errors on the patient's chart and justifying ignoring Mahoney's instructions and adding notation that she was not working); *id.* ¶ 139 (admitting accessing wrong chart but claiming she fixed it once she returned to her office).) But, these incidents all indisputably violated Defendant's policies. (Def.'s 56.1 ¶¶ 98, 106–07, 144.) That Plaintiff believes she performed properly or that Defendant's reasons for terminating her were incorrect does not make them fabricated, let alone make them *discriminatory*. *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (per curiam) ("While [the court] must ensure that employers do not act in a discriminatory fashion, [it] do[es] not sit as a super-personnel department that reexamines an entity's business decisions." (internal quotation marks omitted)); *Testa v. CareFusion*, No. 14-CV-05202, 2018 WL 1611378, at *8 (E.D.N.Y. Apr. 3, 2018) ("An employee's subjective disagreement with his [or her] manager's evaluation of his [or her] performance is not a viable basis for a discrimination claim [under the ADEA]."); *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *8 (E.D.N.Y. July 30, 2013) (noting that "personnel decisions . . .

that are incorrect do not support a federal claim unless they are tainted, at least in part, by illegal discrimination" (alteration and internal quotation marks omitted)); *Grant v. Roche Diagnostics Corp.*, No. 09-CV-1540, 2011 WL 3040913, at *11 (E.D.N.Y. July 20, 2011) ("[I]t is well settled that the mere fact that an employee . . . has evidence that the [employer's] decision was objectively incorrect[] does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for [age discrimination]."); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (holding that "rejection of the defendant's proffered reasons [does not] compel[] judgment for the plaintiff" because the plaintiff "at all times bears the ultimate burden of persuasion" that the decision was intentionally discriminatory (internal quotation marks omitted)); *id.* at 524 ("That the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of [age] is correct.").[24]

Next, Plaintiff argues that Estremera's failure to investigate her complaints about Walker creates a dispute of fact regarding pretext. (Pl.'s Mem. 18.) Construing the record in the light most favorable to Plaintiff, Estremera *was* involved in the decision to terminate Plaintiff. (Good Dep. 16; Estremera Dep. 28–30, 37–38.) However, this fact still fails to show pretext. First, to the extent that Walker's alleged behavior was not based on Plaintiff's age, as noted above, it is unclear how Estremera's failure to investigate complaints about that behavior could be

---

[24] To the extent Plaintiff argues she did not send the fax and thus did not violate HIPAA, this contradicts her deposition testimony, (Pl.'s Dep 123–24, 218 (testifying she did not know if she sent it)), and is still insufficient to show pretext, *see McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what motivated the employer." (italics and internal quotation marks omitted)); *see also Jaiyeola v. Carrier Corp.*, 350 F. App'x 583, 585 (2d Cir. 2009) ("His claim that his supervisor, rather than he, was to blame for failings in his assigned projects gives rise to no inference of discrimination."). In any event, Plaintiff was not fired only for the HIPAA violation, as explained earlier.

discriminatory.  *Cf. Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 158 n.28 (E.D.N.Y. 2002) (explaining that a supervisor's failure to investigate the plaintiff's complaint did not violate Title VII because the alleged remarks were not clearly racially motivated).  Second, Plaintiff cites no evidence in the record that this failure to investigate was based on Plaintiff's age, such as, for example, evidence that Human Resources did investigate complaints by younger employees or complaints about non-age based discrimination.  *See Franklin v. Liberty Lines Transit, Inc.*, No. 13-CV-6701, 2016 WL 1078283, at *11 (S.D.N.Y. Mar. 17, 2016) ("[T]here is no evidence in the record that [the] [d]efendants' purported failure to further investigate [the] [p]laintiff's claim was motivated by race.  [The] [p]laintiff provides absolutely no evidence of [the] [d]efendants ever investigating the explanations or justifications offered by employees at disciplinary hearings."), *aff'd*, 685 F. App'x 41 (2d Cir. 2017); *see also Jones v. Yonkers Pub. Sch.*, 326 F. Supp. 2d 536, 546 (S.D.N.Y. 2004) ("Even assuming that [the] defendants exhibited a high degree of administrative incompetence and unfairness in the present case, the result remains the same because there is no evidence of racial discrimination by [the] defendants.").  Third, this incident is disconnected from Plaintiff's termination.  Even assuming Estremera's failure to investigate Walker's conduct was based on animus, Plaintiff cites no evidence connecting this to her termination some months later.  Rather, the only testimony regarding the termination decision cited by either Party suggests that Estremera and Good, and to a lesser extent Naru, considered the totality of Plaintiff's performance errors—her age is not mentioned. *See Shands v. Lakeland Cent. Sch. Dist.*, No. 15-CV-4260, 2018 WL 3315738, at *17 (S.D.N.Y. July 5, 2018) (noting that the job interviewers did not mention race).[25]

---

[25] For the same reasons, Plaintiff's claim that Good's and Lomangino's refusal to replace Walker as her supervisor on some unspecified date does not create a triable issue of fact as to pretext, because their failure to provide a reason does not alone make this decision

Plaintiff also argues that Defendant "substantially deviated from its own established policies in terminating her." (Pl.'s Mem. 19.) Specifically, Plaintiff argues that Defendant never gave Plaintiff an opportunity to explain the events in the timeline, that she did not receive warnings for first transgressions, and her transgressions were not sufficiently serious to warrant termination. (*Id.* at 19–20.) Although failure to follow an organization's stated policies or routine procedures can be evidence of pretext, *see Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir.1997), Defendant did not do so here. It is undisputed that Defendant has complete discretion to implement whatever level of discipline it sees fit, including termination. (Def.'s 56.1 ¶¶ 56–59; Pl.'s Dep. 83 (acknowledging that the policy permits skipping steps); *id.* at 85 (testifying that the policy permits Defendant to issue discipline at whatever level it wants).) Although Plaintiff believes her misconduct was not "serious" enough to warrant termination, this was a determination for Defendant, not Plaintiff, and, in any event, the policy also permits skipping progressive discipline steps "any time the supervisor determines it is necessary." (Def.'s 56.1 ¶ 60; *see also* Clark Decl. Ex. Q ("Disciplinary Policy") § 3.2 ("The process is progressive and does not begin at the first possible step for each infraction); *id.* § 3.3 ("[T]he process may not start at the lowest level identified if circumstances warrant more severe action.").) Indeed, the policy lists as grounds for termination "[r]efusal to comply with legitimate instructions of supervisory personnel" and "[g]ross negligence in the performance of

---

discriminatory. (Def.'s 56.1 ¶¶ 67–68; Good Dep. 35–36 (testifying that she told Plaintiff no but did not give a reason).) *See Mathews v. Huntington*, 499 F. Supp. 2d 258, 265 (E.D.N.Y. 2007) ("An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." (internal quotation marks omitted)); *see also Mingguo Cho v. City of New York*, 549 F. App'x 15, 18 (2d Cir. 2013) ("[W]ithout more, the fact that the [defendant] did not provide a reason for not hiring [the plaintiff] does not give rise to an inference that the unstated reason was discriminatory.")

duties," (Policy at 7), and it is undisputed that Defendant considered the totality of Plaintiff's performance incidents—not just an individual one—in deciding to terminate her, (Estremera Dep. 37–38 (testifying that "all of the [performance] things were coming together at the same time" and that she and Good decided to "collectively take everything together a as whole")). *See Bucknell v. Refined Sugars, Inc.*, 82 F. Supp. 2d 151, 158 (S.D.N.Y.) (concluding that the defendant did not deviate from its policy, and thus there was no pretext), *aff'd*, 225 F.3d 645 (2d Cir. 2000); *see also McGuire-Welch v. House of the Good Shepherd*, 720 F. App'x 58, 61 (2d Cir. 2018) (finding no pretext because, although the plaintiff argued "that [the] defendants departed from their own policy in terminating her without first providing progressive discipline . . . the record . . . demonstrates no such deviation" because the "defendants considered [the plaintiff's]" actions "to be serious misconduct"). With respect to the claim that Plaintiff received *no* warnings about her performance, this claim is not supported by the record. (*See* Pl.'s Dep. 103–05 (testifying that Plaintiff received verbal warnings in the month prior to termination); Def.'s 56.1 ¶ 75 (meeting regularly with Walker to review Plaintiff's records and the errors in her documentation); *id.* ¶¶ 78, 81–82 (noting that Walker mentioned Plaintiff's "accurate and complete documentation" was under review in 2014 performance evaluation and that she met with Plaintiff to discuss this conduct and for coaching); *id.* ¶ 129 (meeting with Estremera, Good, Campbell, and Kouhout about the fax; Pl.'s 56.1 ¶ 89 (describing a meeting at which several instances of patient care were discussed).)[26] The Parties do dispute whether additional

---

[26] Indeed, Plaintiff mentions that she "received a satisfactory performance review" in 2014, (Pl.'s Mem. 2), but it is undisputed that the review noted issues with Plaintiff's "accurate and complete documentation," (Def.'s 56.1 ¶ 81). In any event, this fact alone cannot show pretext. *See Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F. Supp. 2d 249, 263 (E.D.N.Y. 1999) ("Nor can prior good evaluations of the plaintiff's work performance alone establish that later unsatisfactory evaluations are pretext for unlawful discrimination." (internal quotation marks omitted)), *aff'd*, 201 F.3d 432 (2d Cir. 1999)

warnings were given for some of the incidents in question, (*compare, e.g.*, Def.'s 56.1 ¶¶ 85, 89–90 *with* Pl.'s 56.1 ¶¶ 85, 89–90), and Plaintiff contends that a supervisor never met with her to permit her to explain her actions, (Pl.'s Counter 56.1 ¶ 88) but, Plaintiff has not cited evidence that Defendant's purported failure to follow this part of the policy affected its decision to terminate her, *see Edwards v. Jericho Union Free Sch. Dist.*, 55 F. Supp. 3d 458, 466 (E.D.N.Y. 2014) ("[The] plaintiff has not presented any evidence that the defendants' failure to advise the union that they were going to deny her tenure in any way affected their decision to deny tenure.").  Nor is it clear why these failures to follow policy alone demonstrate *age discrimination*, as Plaintiff has cited no evidence that the supervisors in question did follow this policy for younger employees.  Ultimately, while Defendant's decision to fire Plaintiff without getting her side of the story may have been imprudent, it does not constitute evidence that it was discriminatory.  *See Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998) ("[T]he ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age." (italics omitted))

Plaintiff also argues that she was replaced by someone 15 years younger than her, demonstrating pretext.  (Pl.'s Mem. 20.)  However, that individual was 55 years old at the time of her hiring, (Def.'s 56.1 ¶ 210), which is still a protected age under the ADEA, § 631(a) (requiring an employee be "at least 40 years of age"), undermining a claim of discrimination, *see Testa*, 305 F. Supp. 3d at 435–36 (collecting cases holding that replacement by someone in the same protected class undermines inference of discrimination).  Indeed, since Plaintiff's termination, the Home Health Care Department has hired 13 more employees, 9 of whom are over the age of 40 and 3 of whom are over the age of 60.  (Def.'s 56.1 ¶¶ 207–209.)  In any event, "Plaintiff cannot defeat summary judgment merely by showing that [s]he was replaced by

a younger employee.  Typically, younger workers will replace older ones; this is an unremarkable phenomenon that does not prove discrimination." *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 577–78 (S.D.N.Y. 2010) (alterations and internal quotation marks omitted); *see also Testa*, 305 F. Supp. 3d at 436 (same and collecting cases).  Moreover, other data in this case, which Plaintiff ignores in her opposition, further undermine her pretext claim.  Plaintiff began working for Defendant at approximately 69 or 70 years old, (Def.'s 56.1 ¶ 9), which undermines any inference of discrimination, *see Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) ("When the same actor hires a person already within the protected class, and then later fires that same person, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." (internal quotation marks omitted)).  Plaintiff contends that Defendant did not "hire" her because it did not vet or interview her, but this does not negate that Defendant offered Plaintiff employment when she was already in the protected class, and Plaintiff cites no case to the contrary.  (Pl.'s Mem. 2, 20.)  Furthermore, Plaintiff worked for Walker prior to Defendant's acquisition of St. Francis, while already 67 years old, and Plaintiff cannot explain why walker would have animus at 70 or 71, but not at 67.  (Pl.'s Dep. 236–37.)  *See Browne v. CNN Am., Inc.*, No. 98-CV-1768, 1999 WL 1084236, at *4 (S.D.N.Y. Dec. 1, 1999) (finding inference of discrimination undermined by the fact that "during the [plaintiff's] first three months, when [the supervisor] was equally aware of [the plaintiff's] age . . . his relationship with [the supervisor] was 'real good'"), *aff'd*, 229 F.3d 1135 (2d Cir. 2000).  Moreover, all of Plaintiff's supervisors were within her protected class.  (Def.'s 56.1 ¶ 177.)  *See DiGirolamo v. MetLife Grp., Inc.*, No. 10-CV-1537, 2011 WL 2421292, at *11 (S.D.N.Y. June 6, 2011) (finding age discrimination unlikely where decisionmakers are over 40 years old); *see also Shands*, 2018 WL 3315738, at *15 (collecting cases holding that the fact a

decisionmaker is younger than a plaintiff alone does not show pretext). Additionally, while Plaintiff worked there, 50 of the employees in the Home Health Care Department were over the age of 40, and at least 14 of them—including two managers—were over 60 years old. (Def.'s 56.1 ¶¶ 202–206.)

Plaintiff also argues that Defendant made a "false" claim before the EEOC that she "resigned" and was not terminated. (Pl.'s Mem. 20–21.) If Defendant "offered shifting and somewhat inconsistent explanations for" Plaintiff's termination from its presentation to the EEOC and its arguments in this lawsuit, this could create a factual dispute regarding pretext. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846–47 (2d Cir. 2013). However, such an inconsistency is not present here. Defendant stated in its EEOC filing that Plaintiff "*resigned* after being presented with a series of serious misconduct on her part implicating patient confidentiality and safety that occurred in a short period of time," and that "[s]he was not terminated due to her age, nor was her termination purely because of a violation of HIPAA." (Sussman Aff. Ex. 4 at 2.) This is entirely consistent with Defendant's arguments in this Action: Defendant argues that it terminated Plaintiff based on a series of events, not based on age discrimination, and concedes that Plaintiff revoked her resignation. That Defendant claims Lomangino did not know Plaintiff' rescinded her resignation, (Def.'s 56.1 ¶ 170), and that the Employee Change form also lists resignation, (*id.* ¶ 171), does not mean Defendant is arguing Plaintiff was not terminated. Indeed, Defendant concedes Plaintiff suffered an adverse employment action for purposes of her ADEA claim. (Def.'s Mem. 15.) Therefore, this is not a case in which the employer offered one explanation for its actions before the EEOC and then offered "testimony [that] directly contradicts" that representation and different reasons "never

even mentioned to the EEOC" in the later lawsuit, such that a reasonable juror could infer pretext. *Zann Kwan*, 737 F.3d at 846–47.

Although not advanced as pretext arguments, other facts similarly fail to create a dispute of fact regarding pretext. First, Plaintiff notes that Defendant did not adopt Corporate Compliance's five-day suspension recommendation, instead terminating her. (Pl.'s Mem. 3.) However, it is undisputed that Corporate Compliance is tasked only with investigating HIPAA breaches, (Def.'s 56.1 ¶¶ 116–18), and that the termination decision was based on multiple purported policy infractions within a short period, not just the HIPAA violation, (*e.g.*, Timeline; Estremera Dep. 37–38). Thus, Corporate Compliance's recommendation, even assuming it could be binding, was not applicable to the termination decision. (Estremera Decl. ¶ 12; Policy.) Second, Corporate Compliance offers only recommendations, not binding disciplinary decisions, (Def.'s 56.1 ¶ 124), and the evidence cited by Plaintiff does not dispute this, (Pl.'s 56.1 ¶ 124 (citing Estremera Dep. 20–22 (noting that Corporate Compliance's "recommendation" was 5 days suspension and that supervisors would discuss the "validity of the recommendation"))). *See Martin v. State Univ. of New York*, 704 F. Supp. 2d 202, 232 (E.D.N.Y. 2010) (finding that the defendant's failure to select a candidate from a "list of recommendations . . . is simply not enough" to show pretext).

Third, to the extent that Plaintiff argues that other employees received lesser discipline for HIPAA breaches, (*e.g.*, Pl.'s Mem. 3 ("HIPAA violations were relatively commonplace"); Pl.'s Aff ¶ 7 (same); Pl.'s 56.1 ¶ 201 (same); *id.* ¶¶ 198–99 (claiming suspensions were the norm for first violations of HIPAA and younger nurses received lesser sanctions)), Plaintiff fails to submit evidence that they are similarly situated to her such that their differential treatment indicates discrimination, *see Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A

plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." (internal quotation marks omitted)). [27] Plaintiff does not identify who committed the "scores" of HIPAA violations or who the "younger registered nurses" are that received preferential treatment, let alone their positions, disciplinary background, or even the severity of their HIPAA violation. (Pl.'s 56.1 ¶¶ 199, 201.) *See Bucek v. Gallagher Bassett Servs., Inc.*, No. 16-CV-1344, 2018 WL 1609334, at *14 (S.D.N.Y. Mar. 29, 2018) (collecting cases holding that the plaintiff must provide evidence of proposed comparator's relevant characteristics, such as prior experience an disciplinary history); *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 514 (S.D.N.Y. 2010) ("[V]ague claims of differential treatment alone do not suggest discrimination, unless those treated differently are similarly situated in all material respects." (internal quotation marks omitted)). Indeed, it is undisputed that the persons Plaintiff identified previously either have no record of employment with MHVS, have no record of any HIPAA violation, or had a minimal disciplinary history such that they warranted less discipline than Plaintiff. (Def.'s 56.1 ¶¶ 200–01.) Good did testify that sending incorrect information to a third party happened "[s]everal times a year," but her testimony provides no additional information about the employees purportedly not terminated for such conduct, such that they are materially similar to Plaintiff, who was terminated for other non-HIPAA issues as well. (Good Dep. 23–26.)

Finally, Plaintiff's conclusory testimony that she felt discriminated against, which in any event she does not cite, is insufficient to defeat summary judgment. (Pl.'s Dep. 198–200.) Specifically, Plaintiff testified that she "didn't know why [she] was being" terminated and that

---

[27] The Court notes that Plaintiff waived this argument by failing to respond to Defendant's arguments in her opposition. *See Simon v. City of New York*, No. 14-CV-8391, 2015 WL 4092389, at *2 (S.D.N.Y. July 6, 2015).

aside from Walker's comments, she "guess[ed]" that Lomangino "was implying" age discrimination when she asked Plaintiff "[Y]ou need to do this and this and this, do you understand? Are you able to understand?," unless she was implying that Plaintiff was "retarded." (*Id* at 198–99.) When pressed if she was "just assuming that had to do with [her] age," Plaintiff said "I'm sure," and "I don't know how to answer you any plainer." (*Id.* at 199–200.) This testimony fails to create a dispute of fact as to pretext. *See Shands*, 2018 WL 3315738, at *15 (collecting cases holding that conclusory allegations do not create a dispute of fact as to pretext in ADEA cases); *Parron*, 2018 WL 2538221, at *7 (same, when the plaintiff offers only "conclusory allegations or unsubstantiated speculation" (internal quotation marks omitted)).

Accordingly, because Plaintiff has not proffered evidence sufficient to create a triable issue of fact as to whether her age was the "but for cause of" her termination, the Court grants summary judgment to Defendant. *See Gross*, 557 U.S. at 173.

## III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 26), enter judgment for Defendant, and close this case.

SO ORDERED.

DATED:     August 29, 2018
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

42